**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TRACY DENNIS<br>Woodbridge, Virginia<br>*Plaintiff,* | |
| v. | DEMAND FOR JURY TRIAL |
| INTERNATIONAL REFUGEE ASSISTANCE PROJECT,<br>1 Battery Park Plaza<br>Floor 4,<br>New York, NY 10004 | Civil Action No. 1:26-cv-09025 |
| and | |
| SHARIF ALY, individually,<br>1 Battery Park Plz Apt<br>New York, New York 10005-1405 | |
| ROUBA ANKA, individually,<br>Address unknown | |
| Serve all Defendants (upon agreement of counsel:<br>Christopher M. Helsel<br>Maxfield B. Daley-Watson<br>O'Hagan Meyer<br>225 West 34th Street<br>9th Floor<br>New York, New York 10122 | |
| *Defendants* | |

## COMPLAINT FOR DAMAGES

COMES NOW, Plaintiff, Tracy Dennis (hereinafter "Ms. Dennis" or "Plaintiff") by and through counsel, Eric L. Siegel of Eric Siegel Law, PLLC, and hereby files this action against Defendants International Refugee Assistance Project (hereinafter "IRAP"), Sharif Aly (hereinafter

"Mr. Aly"), and Rouba Anka (hereinafter "Ms. Anka") (collectively "Defendants") and for cause states:

## NATURE OF ACTION

1. Plaintiff, Tracy Dennis, brings this action against Defendants for declaratory, injunctive, and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices, including discriminatory disparate treatment and harassment of Plaintiff due to her race, denial/suspension of equal employment opportunities for her, creation of a hostile work environment, unlawful retaliation after she engaged in protected activity, and the aiding and abetting of unlawful discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, the New York State Human Rights Law, and the New York City Human Rights Law.

2. This case arises from Defendants' race discrimination and retaliation against Ms. Dennis, a Black woman who served as IRAP's Senior Vice President of Global Human Resources from November 20, 2023, until her unlawful termination on December 17, 2025.

3. Throughout her employment, Ms. Dennis was subjected to racially discriminatory and hostile treatment, including greater scrutiny in hiring, race-based and misogynistic targeting, bullying, and microaggressions, public disrespect without executive intervention, exclusion from strategic Human Resources functions, and ultimately termination for alleged cause in retaliation for her complaints about racially discriminatory and unlawful conduct by IRAP.

4. Ms. Dennis was a dedicated employee of IRAP.

5. Ms. Dennis made good faith reports of race discrimination, as well as concerns regarding governance and equity issues as part of her responsibilities as a Human Resources executive.

6. This case exemplifies the unique challenges faced by Black women in employment discrimination litigation.[1] Research demonstrates that Black women are typically less likely to be believed than Black men when making workplace discrimination accusations,[2] requiring courts to carefully examine the coded racism and unconscious biases that specifically target Black women in the workplace. *Harris v. Mayorkas*, 2023 U.S. Dist. LEXIS 131317, at *9-10, n. 3 (E.D. Va. July 17, 2023), *citing Lam v. University of Hawaii*, 40 F.3d 1551, 1562 (9th Cir. 1994) (holding that, because a person's identity "… cannot be neatly reduced to distinct components," "… the attempt to bisect a person's identity at the intersection of race and gender often distorts or ignores the particular nature of their experiences….").

7. As courts have recognized, Black women are subject to unique stereotypes that neither Black men nor White women must endure. *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 958 (6th Cir. 2014); *Zaire v. Protective Training Acad., LLC*, 2019 U.S. Dist. LEXIS 90473, at 18-19 (D. Md. May 19, 2019); *Jeffers v. Thompson*, 264 F.Supp.2d 314, 326 (D. Md. 2003). The discriminatory treatment Ms. Dennis experienced reflects workplace manifestations of historical stereotypes rooted in slavery-era laws that dehumanized Black people, creating lasting patterns of coded language and microaggressions that persist in modern employment settings.

---

[1] *See* Peggie R. Smith, *Separate Identities: Black Women, Work, and Title VII*, 14 Harv. Women's L.J. 21 (1991) (emphasizing the need to examine African American women's claims of "interactive" race-and-gender discrimination within a socio-historical framework); Kufere Laing, *Interpreting the People's Constitution*, 65 How. L.J. 533, 557-67 (2022) (setting out an interpretive framework for Title VII claims that considers the unique experiences of Black women and other intersectional plaintiffs).

[2] Black women are believed less than others regarding discrimination claims, looking at EEOC data from 2011 to 2016 for gender cases and 2010 to 2017 for race cases. Dr. Ashleigh Shelby Rosette found that Black women who were granted financial compensation after being discriminated against were awarded *less* money compared to White women for gender discrimination, but *more* money than Black men who endured racial discrimination.

8. Central to this case is the "angry black woman" stereotype, a harmful myth derived from the portrayal of Black women in cinema and on television, in which they are depicted as "tart-tongued and emasculating, one hand on a hip and the other pointing and jabbing (or arms akimbo), violently and rhythmically rocking her head .... She is a shrill nagger with irrational states of anger and indignation and is often mean-spirited and abusive ... [S]he has venom for anyone who insults or disrespects her."[3] The stereotype supports that, "when Black women engage in assertive or forceful behavior, their conduct is tagged as threatening or deviant, even when it would be tolerated in an employee of a different gender or race."[4]

9. This discriminatory stereotype manifests in workplace practices that systematically disadvantage Black women: expecting them to work without adequate resources, subjecting them

---

[3] *See* Ferris State University, Jim Crow Museum of Racist Memorabilia (2012), https://www.ferris.edu/HTMLS/news/jimcrow/antiblack/sapphire.htm; *see also Heard v. Bd. of Trs. of the Jackson Cmty. Coll.*, 2013 U.S. Dist. LEXIS 4490, at *33 (E.D. Mich. Jan. 11, 2013) (describing "the Angry Black Woman" stereotype, which characterizes "black women as rude, loud, malicious, stubborn, and overbearing"); *Young v. Control Sols., LLC*, 2017 U.S. Dist. LEXIS 93681, at *12-13 (N.D. Ill. June 19, 2017) ("Angry and its synonyms are, standing alone, innocent words with no racial connotation. They are words, however, with a long history as part of a stereotypical depiction of black women that can trace its roots to the institution of slavery. . .. [T]here appears to be an academic consensus regarding both the resilience of this stereotype within American society and its continued detrimental impact upon black women. When a word or concept is so pervasively and enduringly linked to a derogatory stereotype, its use to reference individuals traditionally subject to the stereotype inherently raises the specter of motivation or bias.")

[4] Courts have found that invocation of the "Angry Black Woman" stereotype may serve as evidence of discriminatory animus. *See Curry v. Devereux Found.*, 541 F. Supp. 3d 555, 561 (E.D. Pa. 2021); *Robinson v. City of Atlanta*, 2017 U.S. Dist. LEXIS 207880, at *7 (N.D. Ga. Dec. 21, 2010) (holding that "angry black woman" comments support a claim for discriminatory discharge based on race and sex); *DeBose v. Univ. of S. Fla. Bd. of Trs.*, 2017 U.S. Dist. LEXIS 160841, at *7-8, 24-25 (M.D. Fla. Sep. 29, 2017); *Peeler v. Premier Ambulatory Surgical Ctr., LLC*, 2019 U.S. Dist. LEXIS 250391, at *6 (N.D. Ga. Mar. 29, 2019); *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 272 (2d Cir. 2023). While stereotypical comments fall short of constituting actionable harassment, they may serve as evidence that race motivated certain employment decisions. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989); *Foster v. Dula*, 2023 U.S. Dist. LEXIS 151884, *13-*16 (S.D.N.Y. Aug. 29, 2023).

to harsher criticism while providing less praise, demanding they work harder than white peers, and creating circumstances where Black women are consistently expected to achieve more with less support.[5] These patterns, evident throughout Ms. Dennis's employment, reflect institutionalized discrimination at IRAP rather than individual performance issues.

10. The discriminatory evaluation of Black women's workplace behavior further demonstrates this systematic bias. When Black women are criticized for inappropriate "tone" or labeled as "pushy," "aggressive," or "not a team player"; these descriptors carry coded racial meanings that echo the punishment mechanisms used against Black women during slavery. *Thomas v. Eotech, LLC*, 2014 U.S. Dist. LEXIS 233521, at *4 (D. Md. Dec. 27, 2024). Such racially-charged criticism triggers responses rooted in generational trauma and lifelong experiences of negative stereotyping, creating psychological harm that white women do not experience when receiving similar workplace feedback.

11. The concept of historical trauma, the cumulative emotional and psychological harm that transcends generations from substantial historical events such as slavery and Jim Crow laws, provides essential context for understanding the profound impact of workplace discrimination on Black women, and Ms. Dennis in particular.[6] This internalized trauma amplifies the harm caused by discriminatory workplace practices, making the damages suffered by Ms. Dennis both more

---

5 *See* Examples in Left Out and Left Behind The Hurdles, Hassles, and Heartaches of Achieving Long-Term Legal Careers for Women of Color (2020).

6 *See* Listening to Black Women and Girls: Lived Experiences of Adultification Bias, https://www.law.georgetown.edu/poverty-inequality-center/wp-content/uploads/sites/14/2019/05/Listening-to-Black-Women-and-Girls.pdf (Accessed September 24, 2026); Mohatt NV, Thompson AB, Thai ND, Tebes JK. Historical trauma as public narrative: a conceptual review of how history impacts present-day health. Soc. Sci Med. 2014 Apr; 106: 128-36. Doi:10.1016/j.socscimed.2014.01.043. Epub 2014 Jan 31. PMID: 24561774; PMCID: PMC4001826. https://pmc.ncbi.nlm.nih.gov/articles/PMC4001826/pdf/nihms569976.pdf (retrieved July 18, 2026).

severe and more complex than those experienced by employees who do not carry this historical burden.

12. Plaintiff hereby brings this action for relief based upon causes of action arising from violations of Title VII, Section 1981, the NYSHRL, and the NYCHRL.

## PARTIES

13. Plaintiff Tracy Dennis ("Ms. Dennis" or "Plaintiff") is a Black woman who resides in Woodbridge, Virginia. She was employed by IRAP as Senior Vice President of Global Human Resources from November 20, 2023, until her termination on December 17, 2025.

14. At all times relevant hereto, Plaintiff was an employee in good standing at IRAP.

15. Defendant IRAP provides and facilitates free legal services for vulnerable populations around the world, including refugees, who escape persecution and find safety in the United States and other Western countries, with its principal place of business in New York, New York and its primary mailing address located at1 Battery Park Plaza, Floor 4, New York, NY 10004.

16. Defendant IRAP employs more than fifteen (15) individuals and is an "employer" within the meaning of Title VII, 42 U.S.C. § 1981, the New York City Human Rights Law, and the New York State Human Rights Law.

17. Defendant Sharif Aly is an individual and, at all relevant times, served as IRAP's President. Mr. Aly exercised managerial, supervisory, and decision-making authority over Ms. Dennis, including authority and involvement concerning her compensation, retention, response to complaints, benefits-related matters, and termination. Mr. Aly is sued individually on claims for which individual liability is available, including claims that he personally participated in, aided

and abetted, ratified, or failed to prevent discriminatory and retaliatory conduct after receiving notice of Plaintiff's protected complaints.

18. Defendant Rouba Anka is an individual and, at all relevant times, served in a senior executive and supervisory role at IRAP. Ms. Anka exercised managerial, supervisory, and decision-making authority over Ms. Dennis, including authority and involvement concerning her work assignments, retention compensation, benefits and payroll issues, exclusion from HR-related functions, internal communications, and termination. Ms. Anka is sued individually on claims for which individual liability is available, including claims that she personally participated in, aided and abetted, ratified, or failed to prevent discriminatory and retaliatory conduct after receiving notice of Plaintiff's protected complaints

**JURISDICTION AND VENUE**

19. Subject matter jurisdiction is proper in this Court because this Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981.

20. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's claims under the New York State Human Rights Law and New York City Human Rights Law because such claims are so related to the federal claims as to form part of the same case or controversy.

21. Venue is proper under 28 U.S.C. § 1391(b) because Defendant IRAP operates its United States headquarters in this District at 1 Battery Park Plaza, Floor 4, New York, NY 10004, and a substantial part of the events giving rise to Plaintiff's claims occurred in New York, New York, including but not limited to the decision to terminate her employment.

22. Defendants are subject to personal jurisdiction in this District because, at all relevant times, Defendants maintained minimum contacts and transacted business in New York, Defendant IRAP was an "employer" with respect to Plaintiff, and Defendants committed the acts and omissions alleged herein while acting within the scope of authority in this District.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

23. Prior to filing this Complaint against IRAP, Ms. Dennis filed a Charge of Discrimination with the EEOC on January 6, 2026, which was assigned Charge No. 580-2026-01089 and cross-filed with the Prince William County Human Rights Commission.

24. Ms. Dennis received her Right to Sue letter on July 28, 2026.

25. Accordingly, she has exhausted her administrative remedies pursuant to 29 C.F.R. § 1614.407, which allows her to pursue relief under Title VII in this Court.

26. Ms. Dennis is not required to exhaust administrative remedies as to her claims under the NYSHRL or the NYCHRL, N.Y. CLS Exec. § 297(9); N.Y.C. Admin. Code § 8-502(a); *see also Hernandez v. New York City Law Dep't Corp. Counsel*, 1997 U.S. Dist. LEXIS 620, at *29 (S.D.N.Y. Jan. 23, 1997), nor is she required to exhaust for purposes of her claim under 42 U.S.C. § 1981. *Villavicencio v. Gure-Perez*, 56 F. Supp. 3d 178, 184 (E.D.N.Y. 2014).

**FACTUAL ALLEGATIONS**

**A. Ms. Dennis's Employment, Qualifications, and Senior Leadership Role**

27. Tracy C. Dennis began employment with the International Refugee Assistance Project ("IRAP") on November 20, 2023, and most recently served as Senior Vice President of Global Human Resources, a Chief Human Resource officer ("CHRO")-equivalent role. She most recently earned a salary of $215,000.00, as well as employer-sponsored benefits.

28. She worked primarily remotely from Woodbridge, Virginia, with in-person meetings at IRAP's headquarters in New York and travel consistent with an executive position.

29. Ms. Dennis has extensive experience in Human Resources and holds an M.S. in Conflict Management and Mediation, as well as a B.S. in Human Resource Leadership. She previously worked at the National Immigration Law Center as the Vice President of Human Resources.

30. At all relevant times, Defendant Sharif Aly served as IRAP's President and exercised managerial and decision-making authority over Plaintiff's employment, including her compensation, treatment, response to complaints, and termination.

31. At all relevant times, Defendant Rouba Anka served in a senior executive and supervisory capacity over Plaintiff and exercised managerial and decision-making authority over Plaintiff's employment, including retention efforts, response to complaints, internal investigations, benefits-related issues, and termination.

32. When Ms. Dennis initially sought to join IRAP, she interviewed for a Chief Human Resources Officer ("CHRO") role. After approximately six interviews, the role that was offered to her was a Vice President of Human Resources role and the compensation offer was reduced to $192,000. She later learned that Defendant Mr. Aly, President and CEO of IRAP, had directed the change and provided no explanation.

33. At the time of Ms. Dennis's hire, her $192,000 salary was materially lower than the compensation paid to other Chief-level leaders, including Chief-level employees earning approximately $215,000 and $245,000. Ms. Dennis raised concerns regarding this compensation disparity in November 2023. IRAP did not increase her salary to $215,000 until September 2024, approximately ten months after she first raised the concern.

34. Based upon the HR records available to Ms. Dennis and her subsequent responsibility for HR operations, no other similarly situated employee was subjected to the same extensive criminal and educational background-check process as her.

35. During approximately two years of employment with IRAP, Ms. Dennis did not receive any written discipline, performance warnings, or corrective action plans, nor did she receive formal performance reviews.

36. However, the verbal responses and actions of executive leadership indicated that she was performing exceptionally well throughout her tenure. Leadership regularly assigned her significant responsibilities and expressed appreciation for her work, both verbally and in writing.

37. Throughout the course of her employment, IRAP relied upon Ms. Dennis for enterprise-level Human Resources leadership, including reduction-in-force planning and implementation, union communications and labor strategy, ADP implementation, benefits administration, open enrollment, executive communications, compensation and payroll coordination, global HR operations, employee relations, organizational culture responsibilities, facilities responsibilities, crisis response support, and strategic advising to leadership.

38. Mr. Aly regularly sought the advice of Ms. Dennis, relied on her judgment, and discussed highly sensitive workforce, benefits, union, compensation, staffing, and organizational matters with her.

39. In performing her duties, Ms. Dennis repeatedly sought permission, alignment, and executive approval before moving forward on sensitive IRAP matters. This practice directly contradicts IRAP's purported justification for her later termination and is supported by written and verbal communications with compensation/benefits consultants Megan Carpenter and Kelly Dziedzic.

**B. IRAP Approves and Implements the Executive Benefits Plan**

40. In late 2024 or early 2025, as part of her duties as a Human Resources executive, Ms. Dennis became involved in redesigning IRAP's employee benefits structure. This redesign became part of a much broader cost-reduction and Human Resources Information System ("HRIS") transition effort, involving executive leadership, consultants, Automatic Data Processing, Inc. ("ADP"), payroll, HR, and organizational stakeholders.

41. Mr. Aly was a significant driver in initiating conversations with consultants regarding benefits redesign and cost savings. Additionally, prior to Ms. Dennis's involvement, benefits consultants Megan Carpenter and Marc Sokol were involved in the project.

42. The projected savings of the redesign was approximately $1.2 million. Throughout the project, Ms. Dennis consistently advocated for minimizing disruption to employees and their families while preserving access to benefits.

43. In July 2025, the new executive benefits plan was officially implemented with Mr. Aly's knowledge and involvement in the implementation process.

44. Ms. Dennis interacted directly with Mr. Aly to answer questions and provide information about the benefits during implementation.

45. Accordingly, senior leadership, including but not limited to Mr. Aly, were aware of the plan.

46. At no point was Ms. Dennis instructed not to proceed with the plan's implementation.

47. Ms. Dennis's assistance to executive members with enrollment, together with leadership's knowledge and involvement in its implementation, is contrary to IRAP's subsequent

claim at the time of her termination and post-termination that she went "rogue" and "set up the plan without proper approval."

48. During the development of the plan, an issue arose regarding whether the contribution structure complied with the Collective Bargaining Agreement ("CBA") between IRAP and its employee union.

49. The relevant CBA permitted IRAP to offer multiple insurance products and included language allowing IRAP to amend, modify, add, or delete plans subject to applicable terms.

50. Throughout the plan's development, IRAP leadership, including Ms. Dennis, discussed the issue and its impact on implementation. Mr. Aly was directly involved and asked questions regarding whether the CBA was being misunderstood. This was not a novel issue.

51. Once implemented, the plan remained in effect and accessible to employees through at least February 2026, well after Ms. Dennis departed from IRAP.

### C. Ms. Dennis Raises Repeated Concerns Regarding Discrimination and Inequitable Treatment

52. In mid-2025, Ms. Dennis raised concerns to Mr. Aly and Ms. Kate List about her treatment at IRAP and the treatment of other employees, including race-based and misogynistic targeting, bullying, and microaggressions by Country Director Kurt Bonz, a white male. Ms. Dennis learned that similar concerns regarding Mr. Bonz pre-dated her arrival and had been reported by several other employees.

53. When Ms. Dennis escalated these concerns to Mr. Bonz's supervisor, Kate List, in writing, they were dismissed as "unproven," and Mr. Aly stated that there was "not enough proof." Despite these complaints, IRAP leadership proceeded to support promoting Mr. Bonz to a more senior role.

54. As Senior Vice President of Global Human Resources, Ms. Dennis continued to raise concerns to senior leadership regarding racially discriminatory treatment, governance, and pay equity. Among other concerns, she objected to promotions and interim titles advanced without competitive or equitable selection processes; proposed Executive Leadership Team and Senior Leadership Team restructuring that would consolidate authority and reduce HR and programmatic oversight; and the handling of post-reduction-in-force listening sessions, including the exclusion of HR leadership, including herself, and efforts to alter or reframe outcomes when employee feedback was unfavorable to leadership. Ms. Dennis raised these concerns both in writing and during leadership discussions.

55. She documented that an approximately $2.5 million financial error was acknowledged by Kelly Gramp, a white Executive Vice President overseeing the Development Department, as attributable to her department and that the resulting shortfall increased the number of employees identified for a reduction in force (“RIF”). Despite this acknowledgment and major financial error, Ms. Gramp was retained by IRAP and not subject to termination or part of the RIF.

56. During confidential leadership meetings in which Ms. Dennis participated, the financial error was instead attributed to Luis Arias, a Hispanic male employee who, to Ms. Dennis’s knowledge, did not have decision-making authority over the process that caused the miscounting. Yet, IRAP terminated his employment.

57. Ms. Dennis also reported the concerns of another individual, Aish Shukla, who was concerned about being asked to terminate a Black woman while an underperforming White individual was retained for the sole reason of a leadership member’s desire to retain his wife.

58. In addition to reporting discriminatory and inequitable treatment of other employees, Ms. Dennis reported experiencing similar disparate treatment herself. She was

excluded from meetings and decision-making where HR input was appropriate and required, had concerns regarding leadership conduct minimized or reframed as "interpersonal issues," and was characterized as "aggressive" after raising conduct and equity concerns, a characterization not applied to similarly situated white male or female leaders. Further, she faced increased scrutiny of her work in the months immediately preceding her termination.

59. Ms. Dennis repeatedly requested that concerns regarding her or her team be raised directly with her. Nevertheless, certain members of the Executive Leadership Team, specifically White women, repeatedly bypassed Ms. Dennis and instead raised concerns regarding her or Human Resources with Mr. Aly and/or Ms. Anka. When Ms. Dennis reported this pattern to Ms. Anka and stated that these leaders appeared "afraid" to address her directly, Ms. Anka agreed with her assessment. This conduct undermined Ms. Dennis's authority as IRAP's senior Human Resources leader.

60. During an all-staff meeting, Pedro Sepulveda posted a derogatory comment in the meeting chat while Ms. Dennis was speaking, alluding to his belief that the Human Resources Department, including Ms. Dennis, was "incompetent." Mr. Aly later referenced the incident when apologizing to Ms. Dennis for failing, as President, to speak up and address Mr. Sepulveda's misbehavior.

61. Mr. Aly acknowledged Ms. Dennis's concerns regarding the treatment of Black women in the organization and apologized for failing to intervene in response to disparaging conduct directed toward her.

62. In Fall 2025, Ms. Dennis formally raised concerns in writing to Mr. Aly and Ms. Anka via G-Chat regarding race-based targeting, bullying, and inequitable leadership practices and asked whether she should file a formal EEO complaint.

63. Following Ms. Dennis's complaints, she was excluded from participating in post-RIF listening sessions despite holding the senior Human Resources role responsible for such functions. Other HR personnel participated without her involvement, and Ms. Dennis documented concerns regarding both her exclusion and the subsequent handling and framing of the RIF listening-session outcomes.

64. During a discussion concerning Ms. Dennis's participation in the listening sessions, Kate List stated, in Ms. Anka's presence, that members of the Senior Leadership Team would not want Ms. Dennis involved because they viewed her as responsible for the RIF.

### D. IRAP Encourages Ms. Dennis to Remain Despite Her Complaints of Discrimination

65. In August or September 2025, Ms. Dennis informed Rouba Anka that she was considering another employment opportunity. Ms. Anka reacted urgently, cancelled meetings to speak with Ms. Dennis, and stated that she (Ms. Anka) did not see herself succeeding in her senior IRAP role without Ms. Dennis, evidencing Ms. Dennis's important and successful role at IRAP.

66. Subsequently, in discussing the new IRAP opportunity with Mr. Aly, Ms. Dennis reiterated her concerns about the following:

i. bullying and hostile treatment by staff;
ii. reputational harm;
iii. rude and derogatory comments;
iv. lack of executive intervention;
v. inequitable treatment of Black women;
vi. exclusion from strategic HR responsibilities;
vii. lack of Black representation within executive leadership;
viii. being excluded from listening sessions despite her HR leadership role;
ix. microaggressions; and
x. the significant additional workload she had assumed.

67. Mr. Aly stated that he did not want Ms. Dennis to leave IRAP and instructed her to discuss compensation with Ms. Anka in order to incentivize her to stay at IRAP. Ms. Anka proposed a $10,000 raise, while Ms. Dennis proposed $15,000, which was accepted.

68. Ms. Dennis agreed to stay, giving up an alternative career opportunity, only to be terminated mere months later.

### E. IRAP Subjects Ms. Dennis to Heightened Scrutiny Immediately Before Her Termination

69. Just prior to her termination, Ms. Dennis experienced heightened scrutiny inconsistent with her Human Resources leadership role and prior treatment.

70. Following a spam email, she changed her passwords and access as a security measure. This is standard protocol for such situations.

71. During that same period. Ms. Anka demanded immediate restoration of calendar access to Ms. Dennis' calendar without explanation.

72. To Ms. Dennis's knowledge, calendar sharing was not an organizational requirement.

73. Nonetheless, Ms. Dennis explained the security issue and indicated that access would be restored once updates were completed.

74. Further, when Ms. Dennis sought clarification regarding expectations around a change-in-vendors meeting, Ms. Anka stated that she should have received updates from a junior employee and asserted that Ms. Dennis had missed meetings with that employee. Ms. Dennis denied missing such meetings.

75. Ms. Dennis then asked that any performance concerns be raised directly with her and clarified that she was just seeking performance expectation clarification.

76. Around the same time, during a leadership visit to Jordan, Ms. Anka met with Ms. Dennis's direct report, Heba Al-Risheq, for approximately three hours, while Mr. Aly met with Ms. Al-Risheq (another direct report of Ms. Dennis) for approximately one and a half hours.

77. Ms. Al-Risheq shared with Ms. Dennis that these meetings were uncomfortable and focused on Ms. Dennis rather than routine IRAP operations or human resource issues. Ms. Al-Risheq expressed confusion as to why they were asking so many questions about Ms. Dennis and questioned why Ms. Dennis did not share more with Ms. Anka. Ms. Dennis was targeted.

78. She was terminated just one week later.

### F. <u>IRAP Abruptly Terminates Ms. Dennis "For Cause"</u>

79. On or about December 17, 2025, Ms. Dennis, to her surprise, was summarily terminated during a brief call with Mr. Aly and Ms. Anka. She was informed that her termination was "for cause" and was told that no discussion would occur. The call lasted approximately three minutes. She was not offered severance.

80. Ms. Dennis was not provided any opportunity to respond to the reasons asserted at that time. Ms. Dennis was the fourth African American HR official to be terminated from IRAP over the last five years, without clear reasoning.

81. During the termination call, IRAP leadership asserted that the termination was based on (1) the creation of a benefits plan which Ms. Dennis was allegedly told not to implement and (2) recording calls without permission. Further, they stated that the benefits plan was created simply for her "personal gain."

82. All of these asserted reasons are false.

83. A termination letter was sent to Ms. Dennis's work email address the same day, but the letter addressed logistics only and did not identify the factual or policy basis for the alleged "for cause" designation.

**G. IRAP's Stated Reasons for Termination Are Pretextual And Contradicted by <u>the Circumstances Preceding Her Termination</u>**

***The Benefits Plan***

84. The benefits plan cited during the termination call had been implemented on July 1, 2025, almost six months earlier, during an open enrollment process.

85. Senior leadership, including Mr. Aly, were aware of the plan and its features, and personally enrolled through individual enrollment and system confirmation.

86. Ms. Dennis documented that leadership contacted HR multiple times for assistance with enrollment and that she coordinated directly with leadership regarding implementation.

87. No written directive instructing Ms. Dennis not to proceed with the plan is documented prior to her termination.

***Recording Calls Without Permission***

88. IRAP's Code of Conduct included a provision stating that employees would not record clients, program participants, colleagues, or anyone in the workplace without their consent, while also stating that the rule would not be applied to interfere with rights established by applicable local law, including Section 7 of the National Labor Relations Act.

89. Both New York and Virginia law regarding recording phone calls or in-person conversations are one-party consent states, meaning that only one party who participates in the communication needs to provide consent to record.

90. IRAP's prior practices and leadership's knowledge of workplace recordings are relevant to how the recording provision in the Code of Conduct was understood and applied at

IRAP. During the listening-sessions for IRAP's RIF process, Ms. Dennis informed Ms. Anka that Vinita Hambrick-Brown, an HR professional under Ms. Dennis's supervision, would temporarily record sessions for the limited operational purpose of accurately capturing participant feedback and aggregate themes. Ms. Anka reacted positively and did not object. After approximately two interviews, Ms. Dennis instructed Ms. Hambrick-Brown to discontinue recording and instead use detailed notes, and Ms. Dennis informed Ms. Anka of that change. The listening-session recordings described above were undertaken for operational documentation purposes and were disclosed to Ms. Anka (but not the listening-session participants).

**91.** During Ms. Dennis' employment with IRAP, other IRAP leaders and managers have recorded calls or meetings involving IRAP business without seeking the consent of all parties prior to doing so. Those same leaders and managers were not disciplined and/or terminated for recording those conversations with others.

### H. IRAP Refuses to Explain or Review the Basis for Ms. Dennis's Termination

92. After her termination, Ms. Dennis submitted written requests seeking clarification of the factual and policy basis for the "for cause" designation and requesting preservation of records and evidence. IRAP did not respond to those requests.

93. Ms. Dennis subsequently requested a Board-level governance review. The Board Chair acknowledged receipt of that request and stated that the matter would be reviewed after the holiday period. To date, no findings or written explanation have been provided to Ms. Dennis.

94. As a result of the false accusations made against Ms. Dennis, her career has been damaged, and she remains unable to obtain comparable employment.

## FIRST CAUSE OF ACTION
**Race Discrimination in Violation of Title VII of the Civil Rights Act of 1964**
**42 USCS § 2000e et seq.**
**(Against Defendant IRAP)**

95. Plaintiff realleges and reincorporates by reference the previous paragraphs as if fully set forth herein.

96. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, prohibits employers from discriminating against employees because of their race, including in hiring, promotion, compensation, terms, conditions, and privileges of employment. 42 U.S.C.S. § 2000e-2(a).

97. At all times relevant to this action, IRAP was Ms. Dennis's employer within the meaning of Title VII, employing more than fifteen (15) individuals and engaging in an industry affecting commerce.

98. Ms. Dennis is a member of a protected class under Title VII as a Black woman.

99. When Ms. Dennis originally applied for the Chief Human Resources Officer position, the offer was then converted to a Vice President role, offering a salary at approximately $50,000 less than her similarly situated counterparts who had Chief-level titles.

100. Throughout her employment with IRAP, Ms. Dennis was subjected to race-based misogynistic targeting, bullying, and microaggressions by Country Director Kurt Bonz, dismissed when raising concerns regarding the same, undermined by her colleagues, excluded from projects in which a Human Resources presence is appropriate and required, scrutinized more severely than her White peers, and ultimately terminated. Ms. Dennis regularly reported IRAP's systemic practice in which Black women were subjected to disparate treatment and targeted bullying, whereas White senior leadership were treated favorably and did not receive discipline for similar or more severe misconduct or behavior, often placing the blame on lower-level minority staff.

101. Ms. Dennis was further characterized as "aggressive," implicating the "Angry Black Woman" stereotype, and her concerns were minimized or reframed as "interpersonal issues."

102. Senior leadership, including Mr. Aly, admitted that Black women were treated more harshly than white counterparts at IRAP yet failed to act to mitigate the racially hostile work environment.

103. When Ms. Dennis was terminated, she was one of many employees of color to be terminated while White senior leaders responsible for significant organizational errors, including a $2.5 million financial miscalculation, were retained and not disciplined.

104. Despite knowledge of Mr. Bonz's race-based hostility, IRAP still considered promoting him to a more senior role and, in fact, did so.

105. IRAP's discriminatory conduct was intentional and created disparate treatment based on Ms. Dennis's race, as evidenced by the differential treatment she received compared to similarly situated white employees.

106. IRAP's proffered reasons for its adverse employment actions against Ms. Dennis, including her termination, are pretextual and were motivated by racial discrimination.

107. As a direct and proximate result of IRAP's unlawful race discrimination in violation of Title VII, Ms. Dennis has suffered and continues to suffer monetary and economic damages, including but not limited to loss of past and future income, compensation, and benefits.

108. As a direct and proximate result of IRAP's unlawful race discrimination, Ms. Dennis has suffered and continues to suffer damages for loss of future earning capacity, damage to her professional reputation, and severe mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, issues with sleep, and emotional pain and suffering.

109. IRAP explicitly tolerated a culture of racially-charged commentary and harassment and ratified such conduct by awarding promotions and career-advancing opportunities to those

engaged in such harassment. As such, IRAP's unlawful discriminatory conduct was willful, wanton, and malicious, and was done with conscious disregard of Ms. Dennis's civil rights, entitling her to an award of punitive damages.

110. Ms. Dennis also seeks reimbursement of attorneys' fees, interest, and costs associated with pursuing this civil action.

111. Ms. Dennis seeks injunctive relief to prevent IRAP from engaging in future race-based discrimination and disparate treatment against minority employees. Such injunctive relief should include, but not be limited to, requiring IRAP to implement and maintain non-discriminatory hiring, promotion, compensation, and termination policies; providing mandatory training on federal civil rights laws and unconscious bias for all supervisory personnel; establishing clear procedures for reporting and investigating discrimination complaints; and ensuring equal treatment of all employees regardless of race in work assignments, advancement opportunities, and workplace accommodations. This injunctive relief is necessary to prevent the continuation of the systematic discriminatory practices that Ms. Dennis has endured at IRAP and to ensure compliance with federal civil rights laws.

**<u>SECOND CAUSE OF ACTION</u>**
**Retaliation in Violation of Title VII of the Civil Rights Act of 1964**
**42 USCS § 2000e *et seq*.**
**(Against Defendant IRAP)**

112. Plaintiff realleges and reincorporates by reference the previous paragraphs as if fully set forth herein.

113. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, prohibits employers from retaliating against employees who oppose discriminatory practices or participate in investigations, proceedings, or hearings under Title VII.

114. Ms. Dennis engaged in protected activity under Title VII by repeatedly complaining to senior leadership about race-based discrimination and disparate treatment, including the harsher treatment of Black women, race-based targeting and microaggressions, inequitable promotional practices, and the disproportionate impact of leadership's decisions on employees of color. She also complained about discriminatory treatment directed at her personally and expressly questioned whether she should file a formal EEO complaint.

115. IRAP had knowledge of Ms. Dennis's protected activities, including her complaints about discriminatory treatment.

116. Following Ms. Dennis's protected activity, IRAP subjected her to adverse employment actions, including but not limited to increased scrutiny, exclusion from meetings and decision-making, the undermining of her authority and responsibilities, exclusion from post-reduction-in-force listening sessions while simultaneously placing blame on her for the reduction-in-force, and ultimately her abrupt termination "for cause" on December 17, 2025.

117. There is a causal connection between Ms. Dennis's protected activity and the adverse employment actions taken against her, supported by IRAP leadership's knowledge of Ms. Dennis's repeated protected complaints, the escalating scrutiny and exclusion that followed those complaints, and the close temporal proximity between her protected activity and her abrupt termination on December 17, 2025. Moreover, IRAP's asserted reasons for her termination were pretextual and contradicted by the circumstances surrounding those asserted reasons and were pretextual.

118. IRAP's proffered reasons for the adverse employment actions, including (1) the creation of a benefits plan which Ms. Dennis was, allegedly, told not to implement, and (2)

recording calls without permission, despite no company practice forbidding such acts, are pretextual and were motivated by retaliation for her protected activity.

119. As a direct and proximate result of IRAP's unlawful retaliation, Ms. Dennis has suffered and continues to suffer monetary and economic damages, including but not limited to loss of past and future income, compensation, and benefits.

120. As a direct and proximate result of IRAP's unlawful retaliation, Ms. Dennis has suffered and continues to suffer damages for loss of future earning capacity, damage to her professional reputation, and severe mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, sleep issues, and emotional pain and suffering.

121. IRAP's unlawful retaliatory conduct was willful, wanton, and malicious because it knowingly subjected Ms. Dennis to discriminatory and retaliatory treatment despite her repeated complaints, disregarded her protected rights, and ultimately terminated her "for cause" based on reasons that were unsupported by the actual circumstances and pretextual, entitling her to an award of punitive damages.

122. Ms. Dennis also seeks reimbursement of attorneys' fees, interest, and costs associated with pursuing this civil action.

123. Ms. Dennis also seeks injunctive relief to prevent IRAP from engaging in future race-based retaliation against employees who oppose discrimination or participate in civil rights investigations, including but not limited to implementing policies and procedures to ensure equal treatment of employees regardless of race and prohibiting retaliation against employees who report discrimination.

**<u>THIRD CAUSE OF ACTION</u>**
**Race Discrimination in Violation of 42 U.S.C. § 1981**
**(Against <u>All Defendants</u>)**

124. Plaintiff realleges and reincorporates by reference the previous paragraphs as if fully set forth herein.

125. This claim arises under 42 U.S.C. § 1981, which protects the rights of all individuals to be free from race-based discrimination in contractual relationships. It also applies to an employment relationship, including that which existed between Plaintiff and Defendant IRAP at all relevant times.

126. Ms. Dennis is a member of a protected class under 42 U.S.C. § 1981 as a Black woman.

127. Throughout her employment with IRAP, Ms. Dennis carried out her duties, responsibilities, and tasks as Senior Vice President of Global Human Resources with professionalism and competence.

128. 42 U.S.C. § 1981 also authorizes individual liability against those individuals who retain some affirmative link to causally connect them to the discriminatory action. *Patterson v. County of Oneida*, 375 F. 3d 206, 229 (2nd Cir. 2004).

129. Defendants' discriminatory conduct impaired Ms. Dennis's ability to make and enforce contracts on the same terms as White employees, in violation of Section 1981.

130. When Ms. Dennis originally applied for the Chief Human Resources Officer position, the offer was then converted to a Vice President role, offering a salary at approximately $50,000 less than her similarly situated counterparts who held Chief-level titles. Ms. Dennis later learned that Mr. Aly had ordered this change.

131. Throughout her employment with IRAP, Ms. Dennis was subjected to race-based misogynistic targeting, bullying, and microaggressions by, among others, Country Director Kurt

Bonz, dismissed when raising concerns regarding the same, undermined by her colleagues, excluded from projects in which a Human Resources presence is appropriate and expected, scrutinized more severely than her White peers, and ultimately terminated.

132. Ms. Dennis regularly reported to senior leadership, including Mr. Aly and Ms. Anka, that a systemic practice in which Black women were subjected to disparate treatment and targeted bullying, whereas White senior leadership were treated favorably and did not receive discipline for misconduct, often placing the blame on lower-level minority staff. No action was taken to remedy her concerns.

133. Despite knowledge of his race-based hostility, Mr. Bonz was promoted to a more senior role.

134. Ms. Dennis was further characterized as "aggressive," implicating the "Angry Black Woman" stereotype, and her concerns were minimized or reframed as "interpersonal issues."

135. Mr. Aly admitted that Black women were treated more harshly than white employees yet failed to act in mitigating the racially hostile work environment.

136. When Ms. Dennis was terminated, she was one of many employees of color to be terminated while White senior leaders responsible for significant organizational errors, including a $2.5 million financial miscalculation, were retained and not disciplined.

137. As a direct and proximate result of Defendants' unlawful race discrimination in violation of 42 U.S.C. § 1981, Ms. Dennis has suffered and continues to suffer monetary and economic damages, including but not limited to loss of future income, compensation, and benefits.

138. As a direct and proximate result of Defendants' unlawful discriminatory conduct and violation of 42 U.S.C. § 1981, Plaintiff has suffered and continues to suffer damages for loss of future earning capacity, damage to her professional reputation, and severe mental anguish and

emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, sleep issues, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

139. IRAP explicitly tolerated a culture of discriminatory conduct by awarding promotions and career-advancing opportunities to those engaged in and who did not challenge the discrimination at IRAP, as well as by tolerating the racially-charged hostile environment. As such, IRAP's unlawful discriminatory conduct was willful, wanton, and malicious, as well as demonstrated reckless indifference to Ms. Dennis's civil rights, entitling her to an award of punitive damages.

140. Moreover, Defendants Mr. Aly and Ms. Anka acted with reckless indifference to Plaintiff's protected rights. They knew Plaintiff had raised race-based concerns about disparate treatment, microaggressions, public disrespect, exclusion, and hostile treatment as a Black woman in leadership, yet failed to investigate or take corrective action. Instead, they allowed the conduct to continue. Those facts support punitive damages against Mr. Aly and Ms. Anka as well for knowingly using their authority to assist and/or ratify discriminatory conduct despite clear notice that Plaintiff was asserting race-based workplace concerns. Their conduct was willful, wanton, and malicious, and was done with conscious disregard of Ms. Dennis's civil rights, entitling her to an award of punitive damages against them, jointly and severally.

141. Ms. Dennis also seeks reimbursement of attorneys' fees, interest, and costs associated with pursuing this civil action.

142. Ms. Dennis seeks injunctive relief to prevent IRAP from engaging in future race-based discrimination and disparate treatment against minority employees. Such injunctive relief should include, but not be limited to, requiring IRAP to implement and maintain non-

discriminatory hiring, promotion, compensation, and termination policies; providing mandatory training on federal civil rights laws and unconscious bias for all supervisory personnel; establishing clear procedures for reporting and investigating discrimination complaints; and ensuring equal treatment of all employees regardless of race in work assignments, advancement opportunities, and workplace accommodations. This injunctive relief is necessary to prevent the continuation of the systematic discriminatory practices that Ms. Dennis has endured at IRAP and to ensure compliance with federal civil rights laws.

**FOURTH CAUSE OF ACTION**
**Retaliation in Violation of 42 U.S.C. § 1981**
**(Against All Defendants)**

143. Plaintiff realleges and reincorporates by reference the previous paragraphs as if fully set forth herein.

144. 42 U.S.C. § 1981 prohibits retaliation against individuals who oppose race discrimination or assert their rights under the statute.

145. 42 U.S.C. § 1981 also authorizes individual liability against those individuals who retain some affirmative link to causally connect them to the discriminatory and/or retaliatory action. *Patterson v. County of Oneida*, 375 F. 3d 206, 229 (2nd Cir. 2004).

146. Ms. Dennis engaged in protected activity under 42 U.S.C. § 1981 by opposing race discrimination throughout her employment, including repeatedly complaining to senior leadership, including Mr. Aly and Ms. Rouba, about race-based discrimination and disparate treatment, including the harsher treatment of Black women, race-based targeting and microaggressions, inequitable promotional practices, and the disproportionate impact of leadership decisions on employees of color. She also complained about discriminatory treatment directed at her personally and expressly questioned whether she should file a formal EEO complaint.

147. Defendants had knowledge of Ms. Dennis's protected activity and her opposition to race discrimination, including her formal complaints about discriminatory treatment.

148. Following Ms. Dennis's protected activity, Defendants subjected her to adverse employment actions, including but not limited to increased scrutiny, exclusion from meetings and decision-making, the undermining of her authority and responsibilities, exclusion from post-reduction-in-force listening sessions, and ultimately her abrupt termination "for cause" on December 17, 2025.

149. There is a causal connection between Ms. Dennis's protected activity and the adverse employment actions taken against her, supported by Defendants' knowledge of Ms. Dennis's repeated protected complaints, the escalating scrutiny and exclusion that followed those complaints, and the close temporal proximity between her protected activity and her abrupt termination on December 17, 2025.

150. Moreover, Defendants' stated reasons for her termination are pretextual and contradicted by the circumstances surrounding those asserted reasons and are pretextual.

151. Defendants' proffered reasons for the adverse employment actions, including (1) the creation of a benefits plan which Ms. Dennis was, allegedly, told not to implement, and (2) recording calls without permission, despite no company policy forbidding such acts, are pretextual and were motivated by retaliation for her protected activity.

152. As a direct and proximate result of Defendants' unlawful retaliation in violation of 42 U.S.C. § 1981, Ms. Dennis has suffered and continues to suffer monetary and economic damages, including but not limited to loss of past and future income, compensation, and benefits

153. As a direct and proximate result of Defendants' unlawful retaliation in violation of 42 U.S.C. § 1981, Ms. Dennis has suffered and continues to suffer damages for loss of future

earning capacity, damage to her professional reputation, and severe mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, sleep issues, and emotional pain and suffering.

154. Defendants' unlawful retaliatory conduct was willful, wanton, and malicious because they knowingly subjected Ms. Dennis to discriminatory and retaliatory treatment despite her repeated complaints, disregarded her protected rights, and ultimately terminated her "for cause" based on reasons that were unsupported by the actual circumstances and pretextual, entitling her to an award of punitive damages.

155. Moreover, Defendants Mr. Aly and Ms. Anka acted with reckless indifference to Plaintiff's protected rights. They knew Plaintiff had raised race-based concerns about disparate treatment, microaggressions, public disrespect, exclusion, and hostile treatment as a Black woman in leadership, yet failed to investigate or take corrective action. Instead, they allowed the conduct to continue. Those facts support punitive damages because Mr. Aly and Ms. Anka, jointly or severally, for knowingly using their authority to assist and ratify discriminatory and/or retaliatory conduct despite clear notice that Plaintiff was asserting race-based workplace concerns. Their conduct was willful, wanton, and malicious, and was done with conscious disregard of Ms. Dennis's civil rights, entitling her to an award of punitive damages.

156. Ms. Dennis also seeks reimbursement of attorneys' fees, interest, and costs associated with pursuing this civil action.

157. Ms. Dennis also seeks injunctive relief to prevent Defendants from engaging in future race-based retaliation against employees who oppose discrimination or participate in civil rights investigations, including but not limited to implementing policies and procedures to ensure

equal treatment of employees regardless of race and prohibiting retaliation against employees who report discrimination.

**FIFTH CAUSE OF ACTION**
**Discrimination in Violation of the New York State Human Rights Law**
**(N.Y. CLS Exec. §§ 290, *et seq.*)**
**(Against Defendant IRAP)**

158. Plaintiff realleges and reincorporates by reference the previous paragraphs as if fully set forth herein.

159. The New York State Human Rights Law ("NYSHRL") guarantees "equal opportunity to enjoy a full and productive life" whereby "every individual shall have an equal opportunity to participate fully in the economic, cultural and intellectual life of the state" as the state works towards "eliminat[ing] and prevent[ing] discrimination in employment… and to take other actions against discrimination[.]" N.Y. CLS Exec. § 290(3).

160. The NYSHRL also states: "It shall be an unlawful discriminatory practice…for an employer …, because of an individual's … race, … color, national origin, … to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. CLS Exec. § 296(1)(a).

161. Ms. Dennis is a member of a protected class under the NYSHRL as a Black woman.

162. When Ms. Dennis originally applied for the Chief Human Resources Officer position, the offer was then converted to a Vice President role, offering a salary at approximately $50,000 less than her similarly situated counterparts who held Chief-level titles.

163. Throughout her employment with IRAP, Ms. Dennis was subjected to race-based misogynistic targeting, bullying, and microaggressions by Country Director Kurt Bonz, dismissed when raising concerns regarding the same, undermined by her colleagues, excluded from projects

in which a Human Resources presence is appropriate and expected, scrutinized more severely than her White peers, and ultimately terminated. Ms. Dennis regularly reported that a systemic practice in which Black women were subjected to disparate treatment and targeted bullying, whereas White senior leadership were treated favorably and did not receive discipline for misconduct, often placing the blame on lower-level minority staff.

164. Ms. Dennis was further characterized as "aggressive," implicating the "Angry Black Woman" stereotype, and her concerns were minimized or reframed as "interpersonal issues."

165. Senior leadership admitted that Black women were treated more harshly than white IRAP employees yet failed to act in mitigating the hostile environment.

166. Despite knowledge of his race-based hostility, Mr. Bonz was promoted to a more senior role.

167. When Ms. Dennis was terminated, she was one of many employees of color to be terminated while White senior leaders responsible for significant organizational errors, including a $2.5 million financial miscalculation, were retained and not disciplined.

168. IRAP's discriminatory conduct was intentional and created disparate treatment based on Ms. Dennis's race, as evidenced by the differential treatment she received compared to similarly situated white employees.

169. IRAP's proffered reasons for its adverse employment actions against Ms. Dennis, including her termination, are pretextual and were motivated by racial discrimination.

170. As a direct and proximate result of IRAP's unlawful race discrimination in violation of the NYSHRL, Ms. Dennis has suffered and continues to suffer monetary and economic damages, including but not limited to loss of past and future income, compensation, and benefits.

171. As a direct and proximate result of IRAP's unlawful race discrimination, Ms. Dennis has suffered and continues to suffer damages for loss of future earning capacity, damage to her professional reputation, and severe mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, sleep issues, and emotional pain and suffering.

172. IRAP explicitly tolerated a culture of racially-charged commentary and harassment and ratified such conduct by awarding promotions and career-advancing opportunities to those engaged in such harassment. As such, IRAP's unlawful discriminatory conduct was willful, wanton, and malicious, and was done with conscious disregard of Ms. Dennis's civil rights, entitling her to an award of punitive damages.

173. Ms. Dennis also seeks reimbursement of attorneys' fees, interest, and costs associated with pursuing this civil action.

174. Ms. Dennis seeks injunctive relief to prevent IRAP from engaging in future race-based discrimination and disparate treatment against minority employees. Such injunctive relief should include, but not be limited to, requiring IRAP to implement and maintain non-discriminatory hiring, promotion, compensation, and termination policies; providing mandatory training on federal civil rights laws and unconscious bias for all supervisory personnel; establishing clear procedures for reporting and investigating discrimination complaints; and ensuring equal treatment of all employees regardless of race in work assignments, advancement opportunities, and workplace accommodations. This injunctive relief is necessary to prevent the continuation of the systematic discriminatory practices that Ms. Dennis has endured and to ensure compliance with federal civil rights laws.

## SIXTH CAUSE OF ACTION
**Retaliation in Violation of the New York State Human Rights Law**
**(N.Y. CLS Exec. §§ 290, *et seq.*)**
**(Against Defendant IRAP)**

175. Plaintiff realleges and reincorporates the previous paragraphs as if fully set forth herein.

176. The NYSHRL states: "It shall be an unlawful discriminatory practice…[f]or any employer … to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article." N.Y. CLS Exec. § 296(1)(e).

177. Ms. Dennis engaged in protected activity under the NYSHRL by repeatedly complaining to senior leadership about race-based discrimination and disparate treatment, including the harsher treatment of Black women, race-based targeting and microaggressions, inequitable promotional practices, and the disproportionate impact of leadership decisions on employees of color. She also complained about discriminatory treatment directed at her personally and expressly questioned whether she should file a formal EEO complaint.

178. IRAP had knowledge of Ms. Dennis's protected activities, including her complaints about discriminatory treatment.

179. Following Ms. Dennis's protected activity, IRAP subjected her to adverse employment actions, including but not limited to increased scrutiny, exclusion from meetings and decision-making, the undermining of her authority and responsibilities, exclusion from post-reduction-in-force listening sessions, and ultimately her abrupt termination "for cause" on December 17, 2025.

180. There is a causal connection between Ms. Dennis's protected activity and the adverse employment actions taken against her, supported by IRAP leadership's knowledge of Ms.

Dennis's repeated protected complaints, the escalating scrutiny and exclusion that followed those complaints, and the close temporal proximity between her protected activity and her abrupt termination on December 17, 2025.

181. Moreover, IRAP's stated reasons for Ms. Dennis' termination are pretextual and contradicted by the circumstances surrounding those asserted reasons and were pretextual.

182. IRAP's proffered reasons for the adverse employment actions, including (1) the creation of a benefits plan which Ms. Dennis was, allegedly, told not to implement, and (2) recording calls without permission, despite no company policy forbidding such acts, are pretextual and were motivated by retaliation for her protected activity.

183. As a direct and proximate result of IRAP's unlawful retaliation, Ms. Dennis has suffered and continues to suffer monetary and economic damages, including but not limited to loss of past and future income, compensation, and benefits

184. As a direct and proximate result of IRAP's unlawful retaliation, Ms. Dennis has suffered and continues to suffer damages for loss of future earning capacity, damage to her professional reputation, and severe mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, sleep issues, and emotional pain and suffering.

185. IRAP's unlawful retaliatory conduct was willful, wanton, and malicious because it knowingly subjected Ms. Dennis to discriminatory and retaliatory treatment despite her repeated complaints, disregarded her protected rights, and ultimately terminated her "for cause" based on reasons that were, and are, unsupported by the actual circumstances and pretextual, entitling her to an award of punitive damages.

186. Ms. Dennis also seeks reimbursement of attorneys' fees, interest, and costs associated with pursuing this civil action.

187. Ms. Dennis also seeks injunctive relief to prevent IRAP from engaging in future race-based retaliation against employees who oppose discrimination or participate in civil rights investigations, including but not limited to implementing policies and procedures to ensure equal treatment of employees regardless of race and prohibiting retaliation against employees who report discrimination.

## SEVENTH CAUSE OF ACTION
**Discrimination in Violation of the New York City Human Rights Law**
**(N.Y.C. Admin Code §§ 8-101 *et seq.*)**
**(Against Defendant IRAP)**

188. Plaintiff realleges and reincorporates by reference the previous paragraphs 1-89 as if fully set forth herein.

189. The New York City Human Rights Law ("NYCHRL") declares that "there is no greater danger to the health, morals, safety and welfare of the city and its inhabitants than the existence of groups prejudiced against one another and antagonistic to each other because of their actual or perceived differences, including those based on race…" N.Y.C. Admin Code § 8-101.

190. As such, the NYCHRL makes it unlawful, "[f]or an employer or an employee or agent thereof, because of the actual or perceived … race … color, national origin, …: [t]o discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin Code § 8-107(1)(a)(3).

191. At all times relevant to this action, IRAP was Ms. Dennis's employer within the meaning of the NYCHRL, employing more than four (4) individuals.

192. Ms. Dennis is a member of a protected class under the NYCHRL as a Black woman.

193. When Ms. Dennis originally applied for the Chief Human Resources Officer position, the offer was then converted to a Vice President role, offering a salary at approximately $50,000 less than her similarly situated counterparts who retained Chief-level titles.

194. Throughout her employment with IRAP, Ms. Dennis was subjected to race-based misogynistic targeting, bullying, and microaggressions by Country Director Kurt Bonz, dismissed when raising concerns regarding the same, undermined by her colleagues, excluded from projects in which a Human Resources presence is appropriate and expected, scrutinized more severely than her White peers, and ultimately terminated. Ms. Dennis regularly reported that a systemic practice in which Black women were subjected to disparate treatment and targeted bullying, whereas White senior leadership were treated favorably and did not receive discipline for misconduct, often placing the blame on lower-level minority staff.

195. Ms. Dennis was further characterized as “aggressive,” implicating the “Angry Black Woman” stereotype, and her concerns were minimized or reframed as “interpersonal issues.”

196. Senior leadership admitted that Black women were treated more harshly yet failed to act in mitigating the hostile environment.

197. Despite knowledge of his race-based hostility, Mr. Bonz was promoted to a more senior role.

198. When Ms. Dennis was terminated, she was one of many employees of color to be terminated while White senior leaders responsible for significant organizational errors, including a $2.5 million financial miscalculation, were retained and not disciplined.

199. IRAP’s discriminatory conduct was intentional and created disparate treatment based on Ms. Dennis’s race, as evidenced by the differential treatment she received compared to similarly situated white employees.

200. IRAP's proffered reasons for its adverse employment actions against Ms. Dennis, including her termination, are pretextual and were motivated by racial discrimination.

201. As a direct and proximate result of IRAP's unlawful race discrimination in violation of the NYCHRL, Ms. Dennis has suffered and continues to suffer monetary and economic damages, including but not limited to loss of past and future income, compensation, and benefits.

202. As a direct and proximate result of IRAP's unlawful race discrimination, Ms. Dennis has suffered and continues to suffer damages for loss of future earning capacity, damage to her professional reputation, and severe mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, sleep issues, and emotional pain and suffering.

203. IRAP explicitly tolerated a culture of racially-charged commentary and harassment and ratified such conduct by awarding promotions and career-advancing opportunities to those engaged in such harassment. As such, IRAP's unlawful discriminatory conduct was willful, wanton, and malicious, and was done with conscious disregard of Ms. Dennis's civil rights, entitling her to an award of punitive damages.

204. Ms. Dennis also seeks reimbursement of attorneys' fees, interest, and costs associated with pursuing this civil action.

205. Ms. Dennis seeks injunctive relief to prevent IRAP from engaging in future race-based discrimination and disparate treatment against minority employees. Such injunctive relief should include, but not be limited to, requiring IRAP to implement and maintain non-discriminatory hiring, promotion, compensation, and termination policies; providing mandatory training on federal civil rights laws and unconscious bias for all supervisory personnel; establishing clear procedures for reporting and investigating discrimination complaints; and ensuring equal

treatment of all employees regardless of race in work assignments, advancement opportunities, and workplace accommodations. This injunctive relief is necessary to prevent the continuation of the systematic discriminatory practices that Ms. Dennis has endured and to ensure compliance with federal civil rights laws.

**EIGHTH CAUSE OF ACTION**
**Retaliation in Violation of the New York City Human Rights Law**
**(N.Y.C. Admin Code §§ 8-101 *et seq.*)**
**(Against Defendant IRAP)**

206. Plaintiff realleges and reincorporates by reference the previous paragraphs as if fully set forth herein.

207. The New York City Human Rights Law ("NYCHRL") declares that "there is no greater danger to the health, morals, safety and welfare of the city and its inhabitants than the existence of groups prejudiced against one another and antagonistic to each other because of their actual or perceived differences, including those based on race…" N.Y.C. Admin Code § 8-101.

208. The NYCHRL prohibits retaliation against individuals who oppose race discrimination or assert their rights under the statute. N.Y.C. Admin Code § 8-107(7).

209. Ms. Dennis engaged in protected activity under the NYCHRL by repeatedly complaining to senior leadership about race-based discrimination and disparate treatment, including the harsher treatment of Black women, race-based targeting and microaggressions, inequitable promotional practices, and the disproportionate impact of leadership decisions on employees of color. She also complained about discriminatory treatment directed at her personally and expressly questioned whether she should file a formal EEO complaint.

210. IRAP had knowledge of Ms. Dennis's protected activities, including her complaints about discriminatory treatment.

211. Following Ms. Dennis's protected activity, IRAP subjected her to adverse employment actions, including but not limited to increased scrutiny, exclusion from meetings and decision-making, the undermining of her authority and responsibilities, exclusion from post-reduction-in-force listening sessions, and ultimately her abrupt termination "for cause" on December 17, 2025.

212. There is a causal connection between Ms. Dennis's protected activity and the adverse employment actions taken against her, supported by IRAP leadership's knowledge of Ms. Dennis's repeated protected complaints, the escalating scrutiny and exclusion that followed those complaints, and the close temporal proximity between her protected activity and her abrupt termination on December 17, 2025.

213. Moreover, IRAP's stated reasons for her termination were, and are, contradicted by the circumstances surrounding those asserted reasons and were pretextual.

214. IRAP's proffered reasons for the adverse employment actions, including (1) the creation of a benefits plan which Ms. Dennis was, allegedly, told not to implement, and (2) recording calls without permission, despite no company policy forbidding such acts, are pretextual and were motivated by retaliation for her protected activity.

215. As a direct and proximate result of IRAP's unlawful retaliation, Ms. Dennis has suffered and continues to suffer monetary and economic damages, including but not limited to loss of past and future income, compensation, and benefits

216. As a direct and proximate result of IRAP's unlawful retaliation, Ms. Dennis has suffered and continues to suffer damages for loss of future earning capacity, damage to her professional reputation, and severe mental anguish and emotional distress, including but not

limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, sleep issues, and emotional pain and suffering.

217. IRAP's unlawful retaliatory conduct was willful, wanton, and malicious because it knowingly subjected Ms. Dennis to discriminatory and retaliatory treatment despite her repeated complaints, disregarded her protected rights, and ultimately terminated her "for cause" based on reasons that were unsupported by the actual circumstances and pretextual, entitling her to an award of punitive damages.

218. Ms. Dennis also seeks reimbursement of attorneys' fees, interest, and costs associated with pursuing this civil action.

219. Ms. Dennis also seeks injunctive relief to prevent IRAP from engaging in future race-based retaliation against employees who oppose discrimination or participate in civil rights investigations, including but not limited to implementing policies and procedures to ensure equal treatment of employees regardless of race and prohibiting retaliation against employees who report discrimination.

**NINTH CAUSE OF ACTION**
**Aiding and Abetting Discrimination in Violation of the**
**New York State Human Rights Law**
**(N.Y. CLS Exec. § 296(6))**
**(Against Individual Defendants)**

211. Plaintiff realleges and reincorporates by reference the previous paragraphs as if fully set forth herein.

212. The NYSHRL makes it unlawful for "any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." N.Y. CLS Exec. § 296(6).

213. At all relevant times, Defendant Sharif Aly served as IRAP's President and exercised managerial and decision-making authority over Plaintiff's employment, including her

compensation, treatment, response to complaints, and termination. Mr. Aly is IRAP's President, a decision-maker, and a person with knowledge concerning hiring, compensation, promotion, retention efforts, benefits knowledge, restructuring, complaints raised to him, and Ms. Dennis' termination decision.

214. At all relevant times, Defendant Rouba Anka served in a senior executive and supervisory capacity over Plaintiff and exercised managerial and decision-making authority over Plaintiff's employment, including retention efforts, response to complaints, internal investigations, benefits-related issues, and termination. Rouba Anka is a termination participant and decision-maker regarding Ms. Dennis with knowledge concerning the retention raise, benefits and payroll awareness, exclusion decisions, executive communications, and operations reliance.

215. During Plaintiff's employment, Plaintiff repeatedly raised concerns to Mr. Aly and Ms. Anka regarding differential treatment of Black women, microaggressions, rude and derogatory staff comments, the narrative that white women were "scared" to interact with her, a narrative which Ms. Anka explicitly agreed with, staff circumventing her authority, exclusion from HR-related strategic duties, public disrespect during all-staff meetings, lack of executive intervention, and workplace hostility.

216. Mr. Aly acknowledged that Black women were being treated more harshly than similarly situated white employees and apologized, but he failed to take corrective action to stop the conduct or remediate the discriminatory treatment.

217. Ms. Anka was also aware of Plaintiff's complaints regarding race-based marginalization and hostile treatment. Plaintiff specifically complained to Ms. Anka that she was being marginalized as a Black woman and needed support regarding how she was being spoken to and treated at IRAP.

218. Rather than intervene, investigate, or take reasonable corrective action, Mr. Aly and Ms. Anka permitted the discriminatory treatment to continue, failed to meaningfully address Plaintiff's complaints, and participated in decisions that marginalized Plaintiff from functions within her own HR role.

219. During an all-staff meeting, when Pedro Sepulveda made a derogatory and disrespectful comment toward Plaintiff, neither Mr. Aly nor Ms. Anka intervened. Mr. Aly later privately apologized for failing to speak up, and Plaintiff repeatedly raised concerns that staff were permitted to speak to or about her in ways that undermined her credibility and authority.

220. Mr. Aly and Ms. Anka also participated in excluding Plaintiff from leadership listening sessions even though those sessions fell within Plaintiff's HR responsibilities, reinforcing the pattern of marginalization and differential treatment. Following the RIF, leadership listening sessions were conducted, Plaintiff was excluded despite being head of HR, Kate List reportedly stated in Ms. Anka's presence that Senior Leadership Team ("SLT") members would not want Plaintiff involved because she was viewed as "the reason for the RIF," and Plaintiff objected that listening sessions fell directly within her role.

221. Mr. Aly and Ms. Anka further aided and abetted IRAP's discriminatory treatment by participating in Plaintiff's abrupt termination on December 17, 2025 after she raised race-based concerns.

222. Mr. Aly and Ms. Anka knowingly provided substantial assistance, encouragement, and participation in IRAP's discriminatory conduct by failing to act on Plaintiff's race-based complaints despite their authority to do so, allowing racially disparate treatment and marginalization to continue, participating in the exclusion of Plaintiff from core HR functions, and jointly carrying out the termination decision.

223. Mr. Aly and Ms. Anka's conduct aided, abetted, incited, compelled, and/or coerced discriminatory practices against Plaintiff because of her race, including but not limited to disparate treatment, unequal institutional support, marginalization, selective enforcement, and termination.

224. As a direct and proximate result of Mr. Aly and Ms. Anka's aiding and abetting of unlawful race discrimination in violation of the NYSHRL, Ms. Dennis has suffered and continues to suffer monetary and economic damages, including but not limited to loss of past and future income, compensation, and benefits.

225. As a direct and proximate result of Mr. Aly and Ms. Anka's aiding and abetting of unlawful race discrimination, Ms. Dennis has suffered and continues to suffer damages for loss of future earning capacity, damage to her professional reputation, and severe mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, sleep issues, and emotional pain and suffering.

226. Defendants Mr. Aly and Ms. Anka acted with reckless indifference to Plaintiff's protected rights. They knew Plaintiff had raised race-based concerns about disparate treatment, microaggressions, public disrespect, exclusion, and hostile treatment as a Black woman in leadership, yet failed to investigate or take corrective action. Instead, they allowed the conduct to continue. Those facts support punitive damages against them, jointly or severally, because Mr. Aly and Ms. Anka knowingly used their authority to assist and ratify discriminatory conduct despite clear notice that Plaintiff was asserting race-based workplace concern. Their conduct was willful, wanton, and malicious, and was done with conscious disregard of Ms. Dennis's civil rights, entitled her to an award of punitive damages.

227. Ms. Dennis also seeks reimbursement of attorneys' fees, interest, and costs associated with pursuing this civil action.

**TENTH CAUSE OF ACTION**
**Aiding and Abetting Discrimination in Violation of the New York City Human Rights Law (N.Y.C. Admin. Code § 8-107(6)) (Against Individual Defendants)**

228. Plaintiff realleges and reincorporates by reference the previous paragraphs as if fully set forth herein.

229. The NYCHRL makes it unlawful for "any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so." N.Y.C. Admin. Code § 8-107(6).

230. At all relevant times, Defendant Sharif Aly served as IRAP's President and exercised managerial and decision-making authority over Plaintiff's employment, including her compensation, treatment, response to complaints, and termination. Mr. Aly is identified as IRAP's President, a decision-maker, and a person with knowledge concerning hiring, compensation, promotion, retention efforts, benefits knowledge, restructuring, complaints raised to him, and the termination decision.

231. At all relevant times, Defendant Rouba Anka served in a senior executive and supervisory capacity over Plaintiff and exercised managerial and decision-making authority over Plaintiff's employment, including retention efforts, response to complaints, internal investigations, benefits-related issues, and termination. Ms. Anka is a participant and/or decision-maker for Ms. Dennis' termination with knowledge concerning the retention raise, benefits and payroll awareness, exclusion decisions, executive communications, and operations reliance.

232. During Plaintiff's employment, Plaintiff repeatedly raised concerns to Mr. Aly and Ms. Anka regarding differential treatment of Black women, microaggressions, rude and derogatory staff comments, the narrative that white women were "scared" to interact with her, staff

circumventing her authority, exclusion from HR-related strategic duties, public disrespect during all-staff meetings, lack of executive intervention, and workplace hostility.

233. Mr. Aly acknowledged that Black women were being treated more harshly than white employees and apologized, but he failed to take corrective action to stop the conduct or remediate the discriminatory treatment.

234. Ms. Anka was also aware of Plaintiff's complaints regarding race-based marginalization and hostile treatment. Plaintiff specifically complained to Ms. Anka that she was being marginalized as a Black woman and needed support regarding how she was being spoken to and treated within IRAP.

235. Rather than intervene, investigate, or take reasonable corrective action, Mr. Aly and Ms. Anka permitted the discriminatory treatment to continue, failed to meaningfully address Plaintiff's complaints, and participated in decisions that marginalized Plaintiff from functions within her own HR role.

236. During an all-staff meeting, when Pedro Sepulveda made a derogatory or disrespectful comment toward Plaintiff, neither Mr. Aly nor Ms. Anka intervened. Mr. Aly later privately apologized for failing to speak up, and Plaintiff repeatedly raised concerns that staff were permitted to speak to or about her in ways that undermined her credibility and authority.

237. Mr. Aly and Ms. Anka also participated in excluding Plaintiff from leadership listening sessions even though those sessions fell within Plaintiff's HR responsibilities, reinforcing the pattern of marginalization and differential treatment. Following the RIF, leadership listening sessions were conducted, Plaintiff was excluded despite being head of HR, Kate List reportedly stated in Ms. Anka's presence that Senior Leadership Team members would not want Plaintiff

involved because she was viewed as "the reason for the RIF," and Plaintiff objected that listening sessions fell directly within her role.

238. Mr. Aly and Ms. Anka further aided and abetted IRAP's discriminatory and/or retaliatory treatment by participating in Plaintiff's abrupt termination on December 17, 2025 after she raised race-based concerns.

239. Mr. Aly and Ms. Anka knowingly provided substantial assistance, encouragement, and participation in IRAP's discriminatory and/or retaliatory conduct by failing to act on Plaintiff's race-based complaints despite their authority to do so, allowing racially disparate treatment and marginalization to continue, participating in the exclusion of Plaintiff from core HR functions, and jointly carrying out the termination decision.

240. Mr. Aly and Ms. Anka's conduct aided, abetted, incited, compelled, and/or coerced discriminatory and/or retaliatory practices against Plaintiff because of her race, including but not limited to disparate treatment, unequal institutional support, marginalization, selective enforcement, and termination.

241. As a direct and proximate result of Mr. Aly and Ms. Anka's aiding and abetting of unlawful race discrimination in violation of the NYCHRL, Ms. Dennis has suffered and continues to suffer monetary and economic damages, including but not limited to loss of past and future income, compensation, and benefits.

242. As a direct and proximate result of Mr. Aly and Ms. Anka's aiding and abetting of unlawful race discrimination, Ms. Dennis has suffered and continues to suffer damages for loss of future earning capacity, damage to her professional reputation, and severe mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, sleep issues, and emotional pain and suffering.

243. Defendants Mr. Aly and/or Ms. Anka acted with reckless indifference to Plaintiff's protected rights. They knew Plaintiff had raised race-based concerns about disparate treatment, microaggressions, public disrespect, exclusion, and hostile treatment as a Black woman in leadership, yet failed to investigate or take corrective action. Instead, they allowed the conduct to continue. Those facts support punitive damages against them, jointly or severally, because Mr. Aly and Ms. Anka knowingly used their authority to assist and ratify discriminatory conduct despite clear notice that Plaintiff was asserting race-based workplace concern. Their conduct was willful, wanton, and malicious, and was done with conscious disregard of Ms. Dennis's civil rights, entitling her to an award of punitive damages.

244. Ms. Dennis also seeks reimbursement of attorneys' fees, interest, and costs associated with pursuing this civil action.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for the Court and/or Jury to:

A. Declare Defendant IRAP's conduct of committing race discrimination against Plaintiff Tracy Dennis to be in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*;

B. Declare Defendant IRAP's conduct of committing retaliation against Plaintiff Tracy Dennis to be in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*;

C. Declare all Defendants' conduct of committing race discrimination against Plaintiff Tracy Dennis to be in violation of 42 U.S.C. § 1981;

D. Declare all Defendants' conduct of committing retaliation against Plaintiff Tracy Dennis to be in violation of 42 U.S.C. § 1981;

E. Declare Defendant IRAP's conduct of committing race discrimination against Plaintiff Tracy Dennis to be in violation of the New York State Human Rights Law;

F. Declare Defendant IRAP's conduct of committing retaliation against Plaintiff Tracy Dennis to be in violation of the New York State Human Rights Law;

G. Declare Defendant IRAP's conduct of committing race discrimination against Plaintiff Tracy Dennis to be in violation of the New York City Human Rights Law;

H. Declare Defendant IRAP's conduct of committing retaliation against Plaintiff Tracy Dennis to be in violation of the New York City Human Rights Law;

I. Declare Defendants Sharif Aly and/or Rouba Anka's conduct of aiding and abetting race discrimination to be violation of the New York State Human Rights Law;

J. Declare Defendants Sharif Aly and/or Rouba Anka's conduct of aiding and abetting race discrimination to be violation of the New York City Human Rights Law;

K. Enjoin Defendants to comply with the aforementioned federal and state laws and to cease and desist from engaging in discriminatory and retaliatory conduct;

L. Award to Plaintiff her economic damages against all Defendants, jointly and severally, including but not limited to back pay, front pay, lost wages, lost benefits, lost retirement contributions, and other pecuniary losses in amounts to be proven at trial;

M. Award to Plaintiff against all Defendants, jointly and severally, compensatory damages for emotional distress, mental anguish, pain and suffering, humiliation, embarrassment, damage to her professional reputation, and other non-economic harm in amounts to be proven at trial;

N. Declare Defendants' participation in, aiding and abetting of, and ratification of the discriminatory and/or retaliatory conduct to be malicious, willful, wanton, reckless, and/or deliberately indifferent to Plaintiff's civil rights.

O. Award to Plaintiff punitive damages against all Defendants, including Sharif Aly and Rouba Anka in their individual capacities, jointly and/or severally, in amounts to be determined at trial to the extent permitted by law;

P. Award to Plaintiff her reasonable attorneys' fees and costs incurred in this action pursuant to Title VII, 42 U.S.C. § 1981, the NYSHRL, and the NYCHRL;

Q. Award pre- and post-judgment interest on all monetary sums requested above.

R. Order Defendants to implement and maintain policies and procedures to prevent discrimination, harassment, and retaliation in the workplace, including appropriate training for Defendants Aly and Anka, supervisors and managers; and

S. Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff requests a trial by jury on all claims and issues of fact set forth in this Complaint.

Dated: October 14, 2026

Respectfully submitted,

ERIC SIEGEL LAW, PLLC

*/s/ Eric L. Siegel*

Eric L. Siegel (N.Y. Bar No. 2344935)
888 17th Street, N.W., Suite 1200
Washington, D.C. 20006
Tel: (771) 220-6116
Email: esiegel@ericsiegellaw.com

*Attorney for Plaintiff*